# C. M. HAMILTON v. LOUISA BADGETT et al., Appellants.

### Division Two, April 7, 1922.

1. **CAIRO & FULTON RAILROAD LANDS:** Grants by State: Act of 1855. The provisions of the Act of Congress of 1853 granting certain even-numbered sections of land in Missouri in aid of the Cairo & Fulton Railroad Company "to be disposed of by said State only in the manner following; that is to say, that a quantity of land not exceeding 120 sections, and included within a continuous length of twenty miles of said road, may be sold; and when the Governor of said State shall certify to the Secretary of the Interior that twenty continuous miles of said road is completed, then another like quantity of land hereby granted may be sold," and that "the lands hereby granted shall be subject to the disposition of the Legislature thereof for the purposes aforesaid and no other," are unequivocal and exclusive, and a compliance therewith was a prerequisite to the validity of an act of the Legislature, and the Acts of 1855 (Laws 1855, 1st Ex. Sess., p. 314), attempting to vest the title of odd-numbered sections in said railroad company prior to a compliance with said Federal act, was of no effect, particularly in view of the fact that the State then had no title, and did not acquire any to odd-numbered sections until the enactment of the Act of Congress of 1866.

2. ———: Federal Act of 1866: Odd-Numbered Sections: Failure to File Approved Selections in Local Land Office. The lands selected under the Act of Congress of 1866, which provided that, in case any of the even-numbered sections included in the grant of 1853 to the State in aid of the Cairo & Fulton Railroad had been sold, preempted or reserved, certain odd-numbered sections lying along the outer line of the even-numbered sections previously granted were included in the renewal of said grant thereby made, under like control and conditions, and that for making selections of these odd-numbered sections the Governor was authorized to appoint an agent, whose selections were to be sent to the General Land Office to be approved by the Secretary of the Interior, who was required to certify the list of the approved selections to the local land office, were lands granted to the State by said Act of Congress of 1853, and the two acts vested the title of the odd-numbered sections so selected, as well as of the even-numbered sections, in the State; and where the railroad was completed within the time prescribed by the Act of 1853, and odd-numbered

Hamilton v. Badgett.

sections were selected in 1894, and a list thereof certified to the Secretary of State and approved by him, he was authorized to issue patents therefor to the State; and, being so authorized, the State's title was not defeated by the failure of the Secretary of the Interior to certify his approval of the selections to the local land office, but a patent issued by the Government to the State in 1916, and a patent thereafter issued by the State, conveyed the title.

3. ——: ——: ——: **Inchoate Right.** The right of the State to the title of the lands granted to it by the Act of Congress of 1853 in aid of the Cairo & Fulton Railroad dated from the compliance by the State with its duty imposed by said act and the Act of 1866, but this right did not ripen into title until the Government issued patents for the land; and although the lands were selected in 1894 and the selections duly approved by the Secretary of the Interior, whatever title the State possessed was inchoate until the Government issued its patents to the State in 1916.

4. ——: ——: ——: ——: **Limitations.** The Statute of Limitations does not run against the government of either the United States or the State of Missouri. Where therefore lands were granted to the State by Act of Congress in 1853, but no patent to the State was issued until 1916, and a patent was thereafter issued to plaintiff by the State, his title was not affected by the adverse possession of defendant for ten years after 1904.

Appeal from Butler Circuit Court.—*Hon. Almon Ing, Judge.*

AFFIRMED.

*Henson & Woody* for appellants.

(1) The Act of Congress of February 9, 1853 (10 Stat. 155), granting lands in aid to the Cairo & Fulton Railroad, operated as a grant *in praesenti* and the issuance of a patent was not necessary to pass the title of the lands to the railroad company. St. Louis, Iron Mt. & S. Ry. Co. v. McGee, 75 Mo. 522, 115 U. S. 469, 29 L. Ed. 446; 32 Cyc. 938; Wilson v. Beckwith, 140 Mo. 384; Desert Salt Co. v. Tarpley, 142 U. S. 241, 33 L. Ed. 999; Grinnell v. Railroad, 103 U. S. 736, 26 L. Ed. 456; Land Co. v. Weise, 208 U. S. 233, 52 L. Ed. 466. (2)

The Act of Congress of July 28, 1866, was for the purpose, and had the effect, to revive and extend the provisions of the Act of 1853 for a period of ten years after the date of the passage of the act. St. Louis, I. Mt. & S. Ry. v. McGee, 75 Mo. 522, 115 U. S. 469 29 L. Ed. 446. (3) The lands involved in this suit were "indemnity" lands, the title to which passed to the St. Louis, Iron Mountain & Southern Railroad Company upon the approval of the selection thereof by the Secretary of the Interior on July 12, 1894. 22 R. C. L. 293 (50); 32 Cyc. 960 (11); Barney v. Railroad, 117 U. S. 228, 29 L. Ed. 858; United States v. Railroad, 141 U. S. 384, 35 L. Ed. 766; Railroad v. Price County, 133 U. S. 614, 33 L. Ed. 687. (4) The title having passed to the St. Louis, Iron Mountain and Southern Railroad Company on July 12, 1894, defendants have acquired that title by limitation. R. S. 1909, sec. 1879.

*J. C. Sheppard* for respondent.

(1) The general rule is that the Statute of Limitations does not begin to run until after a patent has been issued. 2 C. J. 216, sec. 448, 450. (a) Whatever exceptions there may be to this rule in other jurisdictions, this court has strictly adhered to it. McIllinney v. Fricke, 61 Mo. 329; Smith v. McCorkle, 105 Mo. 135, 141; Miller v. Dunn, 62 Mo. 216; Widdicumb v. Childers, 84 Mo. 382, 124 U. S. 400; Hammond v. Johnson, 93 Mo. 198; Marshal v. Hill, 246 Mo. 1. (2) Answering appellants' Point I, respondent says that the cases therein cited all involve lands in place, and not indemnity or "lieu" lands. For that reason such cases are not in point in the case at bar. (3) Appellants' Point 2 has reference to the act extending the time for completion of the railroad, and such cases as are there cited are immaterial to a decision of this case. (4) Appellants state in their Point 3 that "the lands involved in this suit were 'indemnity' lands, the title to which passed to the St. Louis. Iron Mountain and Southern Railway Company upon the approval of the selection thereof by the Secretary of the Interior on July 12, 1894." In this appellants are cor-

rect as to the lands in this suit being "indemnity" lands, but are in error as to the remainder of the statement. The cases therein cited by appellants are all where the grant by Congress was to the railroad company direct. In the case at bar, the grant was to the State of Missouri for the use and benefit of the Cairo & Fulton Railroad Company, and the title thereto did not pass even to the State until the selections were made, approved by the Secretary of the Interior, and the approval certified to the State of Missouri. 32 Cyc. 960 (11); Young v. Charnquist, 114 Iowa, 116; Sioux City, St. Paul Railroad Co. v. United States, 159 U. S. 349. Since 1865 the Statute of Limitations has not run against the State. Abernathy v. Dennis, 49 Mo. 469; School Dist. v. Georges, 50 Mo. 195; McCartney v. Alderson, 54 Mo. 320; Wickersham v. Woodback, 59 Mo. 59.

WALKER, J.—This is an appeal from a judgment in an action of ejectment, brought by the plaintiff in the Circuit Court of Butler County, to recover possession of eighty acres of land therein described. The answer was a general denial, a claim of title in fee to the land, an allegation that the plaintiff claims some interest therein adverse to the defendants and that the same be determined in this proceeding. There was a judgment for plaintiff, from which defendants appeal.

This case was tried upon an agreed statement of facts, the pertinent portions of which are as follows:

By an act of Congress approved February 9, 1853 (10 U. S. Stat. at Large, p. 155), certain even-numbered sections of land were granted to the State of Missouri for the purpose, as stated in the act, "of aiding in the making of the Cairo and Fulton Railroad Company and its branches." The lands thus granted to the State were declared by the act to be subject to disposal by the Legislature for the purpose of the grant and none other.

When a number of miles stated in the act had been built a specified quantity of the land was authorized to be sold upon the Governor certifying that fact to the Secretary of the Interior, and upon the sale the proceeds

were applied to the purpose of the grant.

Under an act of Congress approved July 28, 1866 (14 U. S. Stat. at Large, p. 338) reviving and extending the grant to the State of February 9, 1853, it was provided in case any of the even-numbered sections included in that grant had been sold, patented, preempted, or otherwise disposed of or reserved, certain odd-numbered sections lying along the other line of those theretofore granted were included in the renewal of said grant under like custody, control and conditions. The land involved in this controversy is a part of these odd-numbered sections included by the last act in lieu of the even-numbered sections, and is described as the east half of the northeast quarter of section thirty-three, township twenty-six, north, range seven, east, in Butler County.

For the purpose of making the selection of these odd-numbered sections the Governor of the State was authorized to appoint an agent, and the selections made by such agent were sent to the General Land Office in Washington to be approved by the Secretary of the Interior, who, before approving same was required to ascertain whether or not any of the lands selected had previously been disposed of by the United States. If, upon examination, it was found that the selected lands were subject to the grant, the Secretary of the Interior certified the list of those selected, with his approval, and returned the list to the local land office in the jurisdiction where the lands were situated.

The list of selections containing the land in controversy was filed in the General Land Office June 25, 1894, and was approved by the proper authority July 12, 1894. There is no showing that the designated official ever certified his approval to the local land office in the jurisdiction where the land was located.

June 10, 1916, the United States issued a patent covering the land involved to the State of Missouri; and the State in turn issued a patent to same to the St. Louis, Iron Mountain & Southern Railway Company, July 15, 1916. By *mesne* conveyances the title became vested in

the plaintiff unless prevented by the facts set forth in defendant's defense herein.

Defendants went into possession of the land in 1904, and have since had continuous adverse possession of same.

It is conceded that the sole question for determination is, did the title to the land in controversy vest in the St. Louis, Iron Mountain & Southern Railway Company as the successor of the Cairo & Fulton Railroad Company at the date when the selection of such land was approved by the Secretary of the Interior or when said company received the patent therefor?

I.  Whether these lands were "grant" or "indemnity" lands within the meaning of these terms as technically applied to grants of public lands, or whether the grant was *in praesenti*, are not questions, under our view of the facts as interpreted in the light of the Federal statute, necessary to the determination of the matter at issue.

Federal Act Exclusive: Ineffective State Act.

That statute is unequivocal in its terms.  It provides (Sec. 3, p. 339, 14 U. S. Stat. at Large) "that all lands heretofore given to the State of Missouri for the construction of the Cairo and Fulton Railroad, or for the use of said road lying in the State of Missouri, and all lands proposed to be granted by this act for the use or in aid of the road herein named, and lying in said State of Missouri, shall be granted and patented to the said State whenever the road shall be completed through said State, which lands may be held by said State and used toward paying the State the amount of bonds heretofore used by it to aid said company, and all interest accrued or to accrue thereon."

We need not consider in this connection the act of the Missouri Legislature (Laws Mo., 1st Ex. Sess., 1855, p. 314) confirming the incorporation of the Cairo & Fulton Railroad Company and providing (Sec. 3) that the lands granted to the State under the Congressional act of

1853 (supra) might be designated by said railroad company and selected or located in conformity with the provisions of said act and vesting title in said railroad company in said lands for the use and purposes and subject to the condition, reversion and provisions set forth in said act of Congress; and providing further that said railroad company shall locate the lands granted by the act of Congress by such agents as may be appointed by the Governor of this State for that purpose, subject to the approval in said act specified, and requiring a copy of the location of the land aforesaid, if not already made, to be made by the president or chief engineer of said railroad and forwarded to the local land office and the General Land Office as in said act of Congress specified (Sec. 4). This, for the reason that the Federal statute of 1853 (supra) expressly provides the manner in which this land shall be disposed of in Section 5 (10 Stat. at Large, p. 156) in that "the lands hereby granted to said State shall be disposed of by said State only in the manner following; that is to say, that a quantity of land not exceeding one hundred and twenty sections, and included within a continuous length of twenty miles of said road, may be sold; and when the Governor of said State shall certify to the Secretary of the Interior that twenty continuous miles of said road is completed, then another like quantity of land hereby granted may be sold; and so on from time to time until said road is completed." This act further provides (Sec. 4) "that the lands hereby granted to the State shall be subject to the disposal of the Legislature thereof, for the purposes aforesaid and no other." The provisions of the Federal act are exclusive and a compliance with same was a prerequisite to render valid the provisions of the act of the State Legislature. The attempt, therefore, by the State act to vest title in the railroad company prior to a compliance with the Federal act was, as a consequence, of no effect, especially in view of the fact that the State then had no title to the lands. Nor need we consider the State act further than to recognize the procedure it prescribes

when such procedure does not conflict with the Federal act, for the reason that, so far as the record discloses, no attempt was made by the railroad company to comply therewith as a condition precedent to its acquiring title before the passage of the Act of Congress of 1866 (supra).

II.  Looking to this last act, therefore, we find (Sec. 2) that upon satisfactory proof being furnished to the Secretary of the Interior, as therein directed, of the completion of the railroad, the United States was required to issue patents to the State for the lands granted.  To construe this act as authorizing any other course would violate its evident purpose as well as that of the Act of 1853, in that the grant in each of these acts is to the State.  Thus made, it follows as an inevitable conclusion that when the government divested itself of title in the lands it was intended that the State be invested with same.

Grant to State.

The agreed statement of facts shows that the railroad was completed within the time prescribed in the grant, and that said lands included therein, of which the tract in controversy was a part, were selected in June, 1894, and a list of same certified to the Secretary of the Interior and approved by him in July, 1894.  Upon this having been done, he was authorized to issue patents to the same to the State.  That the lands thus selected were located in odd-numbered sections is immaterial in the determination of the question as to whom the Government was to transfer the title when the procedural provisions of the grant had been complied with.  The purpose of the acts of Congress was to aid the State in promoting an internal improvement.  In no other manner could this purpose be effected within the purview of these acts except by investing the State with the title to the lands granted.

III.  It has been held, in another jurisdiction in construing a Federal statute somewhat similar in its general terms to the acts under review, that a certification

by the Secretary of the Interior of his approval of lands selected is necessary to pass the title to same. [Young v. Charnquist, 114 Iowa, 116.] This ruling is based upon the distinction there made between what are termed "lands within place limits" and "indemnity lands." As we intimated in the beginning, that distinction does not arise here. Congress provided in the acts cited that the title to the lands in question shall pass to the State upon its compliance with certain conditions. These conditions having been complied with, the State became entitled to an investiture in the lands. Such a right cannot be held to have been defeated by the failure, as appears from this record, of the Government to comply with some of the prescribed preliminaries of the proceeding; for example, a failure upon the part of the Secretary of the Interior to certify his approval of the selection of the lands in question to the local land office in the jurisdiction where the lands lie. The right of the State to the title of these lands may, therefore, be said to date from its compliance with its duty under the acts of Congress; but this right did not ripen into a title until the Government issued patents to the lands. [Marshall v. Hill, 246 Mo. 1; United States v. Schurz, 102 U. S. 379; Hammond v. Johnston, 93 Mo. l. c. 220.] A patent is in effect a deed. It passes whatever interest the United States has in the land. When, as at bar, the interest is conceded to be absolute, the issuance of the patent to invest the patentee with title becomes evident. [22 R. C. L.—"Public Lands"—Sec. 37, p. 275 and notes.] Until that was done in June, 1916, whatever title the State possessed was inchoate. Thereafter it became absolute, subject, of course, to the conditions of the grant.

*Filing List in Local Land Office.*

IV. Whether the title was in the Federal Government, therefore, or the State, the Statute of Limitations can have no bearing upon the rights of the parties. Against the Government, whether it be the United States or the State, the Statute of Lim-

*Limitations.*

itations does not run. [Gibson v. Chouteau, 13 Wall. 92; Sec. 1314, R. S. 1919; Marshall v. Hill, 246 Mo. 1. c. 23, and cases cited.] For the reasons stated the ruling of St. Louis Ry. v. McGee, 75 Mo. 522, and Wilson v. Beckwith, 140 Mo. 359, are not determinative of the matter at issue. They refer to lands other than those added to the original grant, and they overlook the fact that such grant is direct to the State and therefore cannot be construed to pass a present or any other interest to another.

The title to the land in question did not pass to the State until the issuance of the patent thereto in 1916. No question having been made as to the transfer by patent from the State to the railroad company, we need not concern ourselves therewith. From all of which it follows that the plaintiff acquired title by *mesne* conveyance thereto, and the judgment of the trial court is affirmed. It is so ordered. All concur.